UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

COLEMAN JOSEPH FENTON, JR.,)
                           )
                           )
v.                           )     Criminal No. 02-57-P-S
                           )
                           )     Civil No.  05-181-P-S
UNITED STATES OF AMERICA,  )
                           )
                           )

## RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION

Coleman Fenton is serving a substantial sentence for violations of federal drug, firearms, and explosive laws.  Fenton pursued a direct appeal to the First Circuit presenting multiple grounds and the First Circuit affirmed in part, vacated in part, and remanded for re-sentencing. Through counsel, Fenton filed a 28 U.S.C. § 2255 motion raising six grounds.  In a February 2, 2006, memorandum I recommended that the Court grant the United States' motion for summary dismissal on the grounds that it was untimely.  That recommendation was adopted. Fenton filed a Federal Rule of Civil Procedure 60(b) motion to reopen his 28 U.S.C. § 2255 proceeding which was successful[1] and resulted in an order for the United States to answer the ineffective assistance claims concerning the representation of Attorney David Beneman in subsections (d),(e), (f), (g), (h), (i), (j), (p), (q) and (s) of Fenton's amended 28 U.S.C. § 2255 motion.[2]  The United States

---

[1]       The unique showing by Fenton justifying the re-opening of the 28 U.S.C. § 2255 proceeding centered on the fact that he retained counsel for purposes of the 28 U.S.C. § 2255 motion and the docket and the documentation provided by Fenton created a very serious concern about this attorney's mishandling of the case.

[2]       I am limiting Fenton to the grounds here identified.  In his reply memorandum he brings up many issues that are not related to these ten grounds which were allowed to go forward upon the reopening of the § 2255 proceeding.  For instance, Fenton complains about his attorney's failure to challenge multiple instances of hearsay (Reply Mem. at 10—11); the failure to object to the magistrate judge presiding over jury selection (id. at 12) (the docket reflects that District Court Judge Hornby presided over jury selection); alleges that his attorney colluded with police officers and judicial officers in a "covert war" against him (id. at 13-14); maintains that his attorney failed to

has filed a supplemental response addressing these ten grounds and, after being granted two

extensions of time to file a reply because of lock-down conditions at his prison, Fenton filed a

reply memorandum accompanied by multiple exhibits.[3]  I now recommend that the Court deny

Fenton § 2255 relief for the following reasons.

---

recognize that the Government was pursuing inconsistent theories of liability in his case and Joey Beeler's case (id. at 25-26);charges his attorney with being unfamiliar with amendments to 18 U.S.C. § 924(c) (id. at 27-28); asserts that his attorney should have contested the forfeiture of property (id. at 33-34); and faults his attorney's acquiescence to a protective order (id. at 35).  Fenton also believes that his attorney should have requested a jury instruction addressing testimony by drug addicts (id. at 11) and cites to recent evidence that some of the witnesses who had professed a moral transformation at his trial have shown through their behavior since that these witnesses lied about their rehabilitation (id. at 39).  He further insists that the fact that his attorney took a "social holiday to New York during the two-weeks preceding trial" is indicative of his counsel's lack of dedication.  (Id. at 3, 12.)  In addition Fenton asserts that Attorney Beneman overcharged him and that he did not use all of the $5000 committed to private investigation for that purpose.  (Id. at 2-3.)

And in his reply memorandum Fenton raises new claims that do not pertain to counsel's performance and that are claims he should have raised in his direct appeal.  See United States v. Frady, 456 U.S. 152, 164-65 (1982) ("[W]e have long and consistently affirmed that a collateral challenge may not do service for an appeal.").  He argues that by denying him bail "prosecutors are subjecting the government to 'invited error' doctrine" in that his detention inhibited his ability to prepare a defense.  (Reply Mem. at 16.)  He also asserts that the interstate commerce element of 18 U.S.C. § 924(c) was not met.  (Id. at 37.)

[3]    Fenton has filed a sheaf of exhibits as part of his reply.  In his reply memorandum he does not specify which exhibits are meant to support which of his ten pending 28 U.S.C. § 2255 claims.  Rather, he indicates: "Attached hereto as exhibits are affidavits from members of petitioner's immediate family, and friends, demonstrating the total absence of any investigative effort by attorney Beneman.  He was provided with leads rich in content with which to impeach the government's key witnesses, yet, those leads were ignored without any assessment of their strength by David Beneman."  (Reply Mem. at 32.)

The affidavits are signed  by Fredrick Wilcox, Jodi Lynn Beeler, Kristin Marie Beeler, Irene Fenton, Cynthia Lynn Rouleau, Robert Penny; Colleen Rose Fenton, Kelley Fenton Gorham, and Leslie Ann Fenton.  These affidavits aver things like Fenton would never lie; Fenton  was with Wilcox in a hotel room for all but 20 minutes during a time period crucial to the charged conduct; Fenton's daughter knows that her brother Joey Beeler perjured himself when he testified that Fenton had anything to do with the pipe bomb; Jodi Beeler knows that Brenda Sue Beeler lied at Fenton's trial in order to  get a week's leave from her Army duties; Kristin Beeler knows her dad did not get involved in drug distribution in 1996 and 1997 because of his health; Fenton's mother would have been able to testify to her son's health history and paid Attorney Beneman $10,000 only to  have Beneman avoid her; Cynthia Rouleau noticed changes in Fenton's behavior after treatment with a sulfa drug; Robert Penny knew Fenton as a businessman who experienced cancer and who, to Penny's knowledge, never broke the law; Colleen Fenton's daughter (Fenton's granddaughter) was best friends with the daughter of a member of the jury and Attorney Beneman refused to address this issue; Joey Fenton told Kelly Gorham of two assaults by John Gotti Jr. at the FCI and professed  that he was pressured to implicate Fenton in the pipe bombing by law enforcement; Attorney Beneman refused to call Kelly Gorham or Colleen Fenton to testify; Fenton wanted a new lawyer but Beneman took a $30,000 retainer paid to Walter McKee and threatened to quit; and Leslie Fenton was a bone marrow donor for Fenton and continues to support him.

Fenton has filed a supplemental reply that includes an affidavit from a man who lived in the Fenton residence in his senior year of high school.  (Doc. No. 45-3.)  The thrust of this submission is that this person never was aware of a police involvement or drug use and that during his stay he never saw drugs or explosives.  This submission does not advance Fenton's ten tenable § 2255 claims.

In addition to the affidavits the attachments include one inch of copies of medical records (and medical articles) which certainly illustrate a very prolonged history of medical care.

*Discussion*

**A.      Background**

In its decision on direct appeal, the First Circuit summarized the factual underpinnings of

Fenton's federal prosecution.  It explained that Fenton,

> plied the cocaine trade for a number of years as the prime mover in a drug-trafficking enterprise based in South Portland, Maine. He enlisted a number of other people as accomplices. These recruits included his son, Joey Beeler; his daughter, Kristin Beeler; and their half-sister, Brenda Sue Beeler. All three of these individuals testified for the government at the appellant's trial.
>
> The evidence showed that Joey began selling drugs for his father in 1994, but floated in and out of juvenile correctional facilities for the next two years. Consequently, he did not join the family business in earnest until 1996. His participation continued until October of 1998, when he was arrested. Kristin began selling drugs in 1997 and remained active until sometime in 2001. Brenda Sue got a late start-she did not join the enterprise until 2000 (while still a high-school student)-but stayed in the game until the government's intervention put a halt to the appellant's operations.
>
> The indictment painted a tawdry picture of street-level cocaine sales, supplemented by occasional violence. Count 1 charged the appellant and others with participation in an overarching drug-trafficking conspiracy that operated in Maine from 1996 until 2001. See 21 U.S.C. §§ 841(a)(1), 846. The remaining counts charged specific offenses, including distribution of cocaine on various dates, id. § 841(a)(1); distribution of cocaine within 1,000 feet of a school, id. § 860; enlistment of a minor to assist in conducting narcotics operations, id. § 861(a)(1); malicious destruction of property by means of an explosive device, 18 U.S.C. § 844(i); possession of an unregistered explosive device, 26 U.S.C. §§ 5841, 5861(d); and possession of a destructive device in connection with a drug-trafficking offense, 18 U.S.C. § 924(c).

United States v. Fenton, 367 F.3d 14, 17 -18 (1st Cir. 2004).

**B.      Ineffective Assistance Standard**

"The essence of an ineffective-assistance claim is that counsel's unprofessional errors so

upset the adversarial balance between defense and prosecution that the trial was rendered unfair

and the verdict rendered suspect."  Kimmelman v. Morrison, 477 U.S. 365, 374 (1986).

Strickland v. Washington, 466 U.S. 668 (1984) is the gold standard for reviewing ineffective

assistance claims of this ilk.  "To prove deficient performance," in a § 2255 proceeding, "a

defendant must establish that counsel was not acting within the broad norms of professional competence." Owens v. United States, 483 F.3d 48, 57 (1st Cir. 2007) (citing Strickland, 466 U.S. at 687-91). "Furthermore, to prove prejudice, a defendant must establish that but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." Id. at 57-58 (citing Strickland, 466 U.S. at 694).

Of moment to Fenton's ineffective assistance of counsel claims is the Supreme Court's guidance in Yarborough v. Gentry: "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect. See Strickland, 466 U.S., at 690 (counsel is "strongly presumed" to make decisions in the exercise of professional judgment)." 540 U.S. 1, 8 (2003).[4] "Moreover," Gentry explained, "even if an omission is inadvertent, relief is not automatic. The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." Id. (citing Bell [v. Cone], 535 U.S. 685, 702 (2002), Kimmelman v. Morrison, 477 U.S. 365, 382 (1986); Strickland, 466 U.S. at 689, and United States v. Cronic, 466 U.S. 648, 656 (1984)).[5]

In this Circuit the Court can draw on its first hand knowledge of the trial and counsel's performance, see United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993) ("Moreover, when, as in this case, a petition for federal habeas relief is presented to the judge who presided at the

---

[4]     The opinion, which pertained to trial counsel's closing argument, elaborated:
           To recall the words of Justice (and former Solicitor General) Jackson: "I made three arguments of every case. First came the one that I planned-as I thought, logical, coherent, complete. Second was the one actually presented-interrupted, incoherent, disjointed, disappointing. The third was the utterly devastating argument that I thought of after going to bed that night." Advocacy Before the Supreme Court, 37 A.B.A.J. 801, 803 (1951).
Id. at 8-9.

[5]     Gentry indicated that the presumption of adequate performance "has particular force where a petitioner bases his ineffective-assistance claim solely on the trial record, creating a situation in which a court 'may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive.' " Id. (quoting Massaro v. United States, 538 U.S. 500, 505 (2003)). As noted in Footnote 3, Fenton has filed multiple affidavits and comprehensive medical records to support his assertions of ineffective assistance of counsel. The affidavits of friends generally testifying to the individual's belief in Fenton's conduct being noncriminal do not raise an issue about counsel's performance. The affidavits of family members really demonstrate what a muddle of shifting familial alliances and counter alliances with which counsel was confronted.

petitioner's trial, the judge is at liberty to employ the knowledge gleaned during previous

proceedings and make findings based thereon without convening an additional hearing."), and

may analyze the ineffective assistance claims by objectively assessing counsel's performance,

Cofske v. United States,  290 F.3d 437, 444 (1st Cir. 2002) (" If anything turned on counsel's

precise thought process, we would remand for an evidentiary hearing, but in this case none is

necessary. The Strickland test, as already noted, is an objective one; as long as counsel

performed as a competent lawyer would, his or her detailed subjective reasoning is beside the

point.").[6]

## C.  The Pending 28 U.S.C. § 2255 Claims

### 1.   *Failure to challenge the installation of video cameras (d)*

Fenton believes that his trial counsel should have mounted a Fourth Amendment

challenge to the installation and monitoring of video cameras near homes that Fenton visited or

occupied.   (Pro se § 2255 Mot. at A-5-A-6, Doc. No. 20-3.)  He explains:

> Officers and agents never received a court order authorizing the
> installation of such a video camera in order to monitor my activities and to
> identify visitors to my residence.  This was a definite invasion of my right to
> privacy, as guaranteed by the Fourth Amendment, yet David Beneman refused to
> develop it as an issue in any manner.

(Id.)  In his reply brief Fenton demonstrates that this claim is based on his speculation that there

might have been grounds for a challenge.  He states:  "Whether the camera was located in a

public area, where no warrant was required, or whether it could observe and record events not

visible to the ordinary human eye, remained uncontested by Mr. Beneman.  Events recorded by

---

[6]      See  Paul v. United States, 534 F.3d 832, 837 (8th 2008) (noting a circuit split as to whether a court views
counsel's strategic choices objectively or must make an inquiry into counsel's subjective decision, citing Cofske as
condoning this objective approach). I make particular note of this because Fenton invokes a right to an evidentiary
hearing and faults the Government for not supporting its motion with an affidavit by Attorney Beneman.

the video-camera were utilized by agent Buchanan in his application for a search warrant of petitioner's residence."  (Reply Mem. at 9.)

The United States cites to <u>Kyllo v. Unites States</u>, 533 U.S. 27 (2001), a case addressing thermal imaging from the outside of the home to the inside of the home.  It also cites to <u>United States v. Hensel</u>, 699 F.2d 18 (1st Cir. 1983) which discusses law enforcement's use of "nightscopes, spotting scopes, binoculars, telescopes, and aerial surveillance."  <u>Id.</u> at 41.

The bottom line is that there is no real <u>Strickland</u> performance issue here because there were no grounds for a Fourth Amendment challenge to this law enforcement practice.  Fenton is guessing that there might be a factual basis to challenge this surveillance but he has presented no evidence or even a summary of a proposed factual predicate for a Fourth Amendment challenge that would permit consideration of this issue under the ineffective assistance of counsel standard.

### 2.    *Failure to challenge search warrants, wiretaps, and recordings (e)*

Fenton also faults Attorney Beneman for refusing to attack the validity of search warrants issued against Fenton's and his mother's residences.  (<u>Pro se</u> § 2255 Mot. at A-6 – A-13.)  Fenton claims that agents and officers orchestrated the planting of items in his residence – such as a book on bomb building and cocaine– by involving Fenton's children, friends, and acquaintances in deceit and fabrications.  (<u>Id.</u> at A-6 –A-7, A-12.)  Fenton cites various incidents of alleged police misconduct, unrelated to his case, by officers involved in Fenton's case and a romantic relationship between one officer and one of his daughters.  According to Fenton this affair resulted in his daughter becoming a spy for the Portland Police Department, a relationship which allegedly paved the way for the officer's access to Fenton's computer.  (<u>Id.</u> at A-7 –A-12.)  Fenton references his attorney's previous success in suppressing evidence from searches for other defendants and argues that the only explanation for his not doing so in Fenton's case was that he

6

was acting as a double agent (having represented the Portland Police Department on a prior occasion).  (Id. at A-9, A-11-A.12.)  Attorney Benemen, according to Fenton, also refused to challenge the fact that his conversations with Fenton were recorded by the Government or to lodge a challenge to court-ordered wiretaps.  (Id. at A-9-A-10; Reply Mem. at 21.)

In his reply memorandum Fenton revisits these discontents.[7]  He maintains: "It is unheard of for a magistrate to issue Search Warrants for several separate and distinct residences based on a single affidavit….Attorney Beneman could easily have challenged the Warrants on the basis that by combining the search warrants, it rendered impossible precisely the basis for issuing a Search Warrant for each residence.  Therefore, probable cause could not have existed."  (Reply Mem. at 9.)

With respect to the wiretaps Fenton cites United States v. Rice, 478 F.3d 704 (6th Cir. 2007), a case upholding a district court's suppression of the fruits of a wiretap.  He also argues, for the first time, that this failure vis-à-vis the wiretaps was compounded when counsel allowed written transcriptions of these recordings to go into the jury room, a decision so questionable that the judge raised the concern in court.  (Id. at 10; Trial Tr. at 859-63.)

The United States makes a few very salient points in response to this rather sprawling ground.  Taking them out of order, Fenton has not made a Strickland showing of prejudices as to the alleged effort of non-law-enforcement individuals to plant a bomb-making book and cocaine in his residence because, according to his own version of facts, Fenton was able to scuttle the efforts to plant this evidence prior to the searches.  In addition,

---

[7]     In his reply memorandum Fenton asserts that the affidavit in support of the search warrant relied on information gathered as a consequence of a message left on Fenton's answering machine by Robert Maynard who Fenton is sure was coached by law enforcement vis-à-vis the contents of the message.  (Reply Mem. at 5-6.)  Not only is this a new factual basis for challenging the warrant regarding which the United States has not had an opportunity to respond, it is such a tenuous ground for a defense motion to suppress that it simply does not strengthen Fenton's argument as to his attorney's ineffectiveness.

> when agents executed a search warrant at Fenton's house on December 7, 2001, they found only folded paper containing residue, a scale, records, and white powder residue in a safe. Juxtaposed against the other trial evidence, which included testimony of three of Fenton's offspring, one daughter's boyfriend, five other drug cohorts, investigators, and the victim of the bombing, the fruits of the searches paled in significance. Thus, even if the seized evidence should have been excluded from trial, the outcome of the proceeding would not have changed. Fenton suffered no prejudice.

(Gov't Suppl. Resp. at 6.)

Second, Fenton's claim is based more on the duplicitous activities of families, friends, and associates than on the conduct of government agents. "[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. 347, 351 (1967) (citing Lewis v. United States, 385 U.S. 206, 210 (1966) and United States v. Lee, 274 U.S. 559, 563 (1927).)  With respect to any entrapment aspect of this ineffective assistance claim, counsel would not have had a tenable basis for challenging this law enforcement operation relying on family members and associates involved in the same criminal conduct.  See United States v. Gendron, 18 F.3d 955, 961-63 (1st Cir. 1994).  Fenton does speculate that one of the involved officers, DeCourcey, had an affair with his daughter, Jodi Beeler.  However, neither Officer DeCourcey nor Jodi testified at trial so it is hard to see how defense counsel could have made any measurable impact on the defense by highlighting this relationship.

In terms of the mechanics of the search warrants, I note that Fenton is mistaken in characterizing this practice of relying on one affidavit in support of separate search warrants as "unheard of."  See United States v. Bigos, 459 F.2d 639, 642 (1st Cir. 1972).  And the United States notes that Fenton does not suggest that the searches in question were not conducted pursuant to valid warrants and he has not made a showing that there were grounds for Attorney Beneman to make "a substantial preliminary showing that a false statement knowingly and

intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and that  "the allegedly false statement" was "necessary to the finding of probable cause." Franks v. Delaware, 438 U.S. 154, 155-56 (1978).

> As for the wiretapping:
>
> The Government agrees that conversations involving Fenton, his daughter Kristin, drug customers Tina Wildes, Christopher Trynor, Jim Lowery, Gene Villacci, Millard Ellis, and Tom Tiberii were recorded pursuant to a court-ordered wiretap of Fenton's telephone at Ocean Street in Portland between September 27 and December 7, 2001 and recordings of some calls were admitted at trial. Although Fenton complains that the wiretap was illegal, he offers no plausible legal basis on which Beneman could have challenged it. See United States v. Lopez, 300 F.3d 46 (1st Cir. 2002) (explaining requirements Government must meet to obtain court authorization for wiretap). Fenton's complaint at A-9 and A-10 of his memorandum that Beneman failed to interview unidentified witnesses who would have established that his daughter Jodi was coached into making the calls against her will fails both parts of the Sixth Amendment test because Fenton has not identified the pertinent witnesses and also because Jodi did not testify at trial. See  [United States v.] Hart, 933 F.2d [80,] 83 [(1st Cir. 1991)] (rejecting challenge to counsel's failure to secure testimony from "that person" or "certain persons").

(Gov't Suppl. Resp. at 10-11.)  Fenton does not explain how the wiretaps in his case compare to those at issue in Rice.  Furthermore, the referenced parts of the trial transcripts reveal that the transcripts of the wiretaps went into the jury room as part of a reasonable strategic compromise arrived at after defense counsel objected to the admission of Government Exhibit 181, a summary chart designed to "aid" the jury.  It seems apparent from the context of the discussion that defense counsel did not want the jury to have the Government's summary of the evidence before it in the jury room, but did agree that the transcripts were accurate and could aid the jury.

Respecting Fenton's contention that his conversations with counsel were illegally recorded on the day of the proposed proffer, the United States observes that there is no indication that such a recorded conversation was ever introduced at trial so there was nothing to suppress. Even assuming Fenton could produce evidence that this recording actually occurred, Fenton has

not described how he thinks that the alleged recording concretely disadvantaged his defense; he has not even hinted at the content of this conversation.

The final aspect of this ground is Fenton's complaint that in the week before trial Attorney Beneman had him meet with prosecutors and agents with the intent of getting Fenton to confess to uncharged crimes and elements of his offense.  (Pro se Sec. 2255 Mot. at A-9.) Fenton explains that he thought the purpose of this meeting was to solidify his alibi defense, a defense built upon Fenton's health history and the flooding of his household during 1996 and 1997.  (Reply Mem. at 19- 25.)  He faults his attorney for exposing him to "unknown culpability with no guarantee of immunity or a possible plea agreement."  (Id. at 21.)  However, Fenton fails to explain how this meeting negatively impacted the defense.  He may have been irritated by counsel's representation as to the purpose of this meeting but Fenton admits that he was able to deal with the situation without harm to his cause.

### 3.       Failure to cross-examine Bryant Feyler (f)

Fenton also maintains that his attorney performed inadequately when he declined to cross-examine "one of the prosecution's star witnesses, i.e., Bryant Feyler."  (Pro se § 2255 Mot. at A-13.)  Fenton emphasizes that Feyler was not a government informant and that "he was most likely willing to provide favorable testimony for the defense."  (Id.)  Fenton believes that cross-examination of Feyler would have uncovered that Feyler was struck by agents, including Joseph Robitaille, when Feyler refused to cooperate with their investigation by wearing a wire to record his conversation with Fenton.  (Id.)  Attorney Beneman was apprised of this situation but he refused to elicit this testimony from Feyler, thereby missing an opportunity to support an inference that agents were coercing false testimony.  (Id.)

In answer, the United States opines:

> [N]o Sixth Amendment violation resulted because Beneman did not cross-examine Bryant Feyler, who helped Joey Beeler to bomb the wrong person's car in retaliation for a drug deal gone awry. As the trial transcript shows, the AUSA covered most of the relevant bases for impeaching Feyler in its direct case. These grounds included Feyler's relationship with Fenton's daughter Kristin, Feyler's guilty plea and sentence, his testimony under a compulsion order, and his drug use and prior convictions....[8] Moreover, that Feyler might not have been a willing witness was evident to the jury independent of the hearsay evidence that one of the investigators allegedly struck him. As the Government itself elicited, Feyler was the subject of a compulsion order. Even if the purported efforts to resort to violence to secure Feyler's cooperation did amount to further impeachment, it would have been merely cumulative. See Conley, 415 F.3d at 189. Counsel was under no duty to offer cumulative evidence nor was there any prejudice to Fenton. See Strickland, 466 U.S. at 687.

(Gov't Suppl. Resp. at 11-12.)

Fenton may believe that this piece of information would have led the jury to conclude that the United States was coercing false testimony but the trial record shows that this would have had scant impact indeed, as this Court can assess from its first hand experience, see McGill, 11 F.3d at 225.  What is more, convincing Feyler to wear a wire does not translate into the production of "false" testimony.  Fenton might feel that this law enforcement tactic is underhanded and reprehensible but the point of the method is the disclosure of the nature of actual criminal activity.  And that is the danger to the defendant – the disclosure of what is true (if perceived as ill gotten) information rather than what is false.

### 4 &5.   Failure to offer into evidence a tape of a conversation between Joey Beeler and Kelly Fenton (g) and failure to cross-examine Joey Beeler concerning the sale of a stolen computer (q)

Fenton further believes that Attorney Beneman performed inadequately when he did not utilize tape-recorded conversations between Joey Beeler and his sister, Kelly Fenton.  (Pro se § 2255 Mot. at A-13-A-14.)  According to Fenton, in at least one of these conversations Joey admitted to Kelly that Fenton did not posses knowledge of the bombing on July 27, 2007.

---

[8]   The United States also asserts that this allegation by Fenton is unsworn and is inadmissible hearsay. Fenton maintains that he sufficiently complied with the oath requirement.

Fenton relates that Kelly provided a copy of this recorded conversation to defense counsel but this evidence was not introduced at trial by either side.  (Id. at a-14.)  Fenton cannot imagine any tactical or strategic reason not to introduce the recording or to question Joey on this issue.  (Id.)  Fenton has not provided the court with a copy of this recording; with his reply memorandum he has filed an affidavit executed by Kelley Fenton that represents that Joey Beeler told her that Fenton did not know anything about the bombing.

For its part, the United States cannot imagine any tactical or strategic reason for introducing the tape recording as it would have had no impact on Joey Beeler's credibility or any other issue of relevance at the trial.

As indicated above: "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." Gentry, 540 U.S. at 8.  Given the complexion of this trial and, in particular, the shifting schisms of family loyalties and disloyalties that surfaced over the course of the prosecution of multiple defendants, Fenton cannot meet the Strickland performance or prejudice prong apropos counsel's failure to attempt to introduce this alleged recording between Kelly and Joey.  While I do not agree with the Government that there could be no tactical reason to seek admission of this evidence given the significance of the pipe bombing count, this is not a case in which counsel could have completely discredited the Government's theory that Fenton was involved in the pipe bombing by the introduction of this singular piece of evidence.  Competent counsel could well have made a smart strategic choice not to highlight for the jury the mutual finger-pointing between father and son concerning the bungled retaliatory pipe-bombing.[9]

---

[9]       In his reply memorandum Fenton maintains that counsel did not adequately research sworn and unsworn statements by Joey Beeler absolving Fenton.  (Reply Mem. at 22.)  He references an affidavit filed by Beeler in his own 28 U.S.C. § 2255 proceeding denying a conspiracy to pipe bomb the car.  (Id.)  He thinks that the defense could have proven that Beeler was perjuring himself and, thereby, obtained a dismissal of the pipe bomb count as against

In his ineffective assistance of counsel claim concerning the cross-examination of Joey

Beeler on the sale of a computer, Fenton explains that Joey Beeler obtained $1600 from the sale

of a computer loaded with expensive software that he stole from Gretchen Sheehy following a

fire, money he used to purchase fake cocaine from Carol Dorney in July 1997.  Sheehy in turn

received $10,000 in an insurance settlement from the fire.  (Pro se § 2255 Mot. at A-21.)  Fenton

believes that Attorney Beneman should have cross-examined Joey on this illegal transaction to

impeach Joey's character.  (Id.)  He also feels that this information, when combined with the

above discussed impeachment of Carol Dorney, would have eliminated Fenton as the source of

money Joey used to purchase the fake cocaine from Carol Dorney and her nephew and absolved

Fenton of the conspiracy to bomb charge.  (Id. at A -22.)  Fenton does not revisit this ground in

his reply memorandum.[10]

As the United States notes, the evidence against Joey Beeler would not have been

admissible under Federal Rule of Evidence 404(a) if offered for the purpose of demonstrating

Joey's bad character.  United States v. Procopio, 88 F.3d 21, 31 (1st Cir. 1996) ("[An] inference-

that the defendants were of bad character-was precisely the inference that Rule 404(a) forbids.").

Both theses grounds focus on the possibility of disassociating Fenton from the car

bombing conspiracy.  The First Circuit addressed the connection of drug related activities to the

pipe bomb as follows:

> Certain counts in the indictment focused on the appellant's alleged
> involvement in the manufacture and deployment of a homemade pipe bomb.
> Count 31 charged the appellant with malicious damage to a vehicle through the
> use of explosive materials in violation of 18 U.S.C. § 844(i); count 32 charged
> him with possession of an unregistered destructive device in violation of 26

Fenton.  (Id.)  Fenton also refers to a phone call between Beeler and himself the content of which was relied on in
support of the search warrant.  (Id. at 22-23.)

[10]     In his reply memorandum Fenton does raise a different complaint vis-à-vis Joey Beeler and counsel's
failure to argue that his grand jury testimony was coerced by a threat to return him to a prison where he had been
beaten by John Gotti, Jr.  (Reply Mem. at 26-27.)

U.S.C. §§ 5841 and 5861(d); and count 33 charged him with possession of a destructive device in connection with a drug-trafficking offense in violation of 18 U.S.C. § 924(c). The appellant complains that these charges were improperly joined with the drug-trafficking counts. In a related vein, he complains that Judge Carter improvidently denied his motion to sever these purportedly dissimilar charges. Neither plaint is compelling.

Although the indictment charged the appellant with engaging in a long-running conspiracy, the multitude of "specific offense" counts related to cocaine sales in the last quarter of 2001. The indictment also charged the appellant, in the same time frame, with involving a minor (Brenda Sue) in drug-trafficking operations. The government's evidence about illicit activities in 2001 was very potent. It included taped telephone conversations, the corroborating testimony of several customers, drug residue and paraphernalia seized during two warrant-backed searches, and the turncoat testimony of two cooperating coconspirators (Kristin and Brenda Sue) who were active in that time frame.

The pipe bomb charges arose out of earlier events, and the appellant characterizes the government's evidence as much weaker. The case for the earlier period was based largely on the testimony of other participants (most prominently, Joey Beeler). This testimony indicated that, at one point in mid-1997, the appellant's supplier, Stephanie Davis, ran out of inventory. The appellant gave Joey funds to purchase cocaine elsewhere. Joey approached Carol Ann Dorney, who took the money with the understanding that she would procure cocaine from her nephew, Patrick Dorney. Carol Ann returned with a package of white powder. Joey soon discovered that the powder was crushed Tylenol. Despite his immediate protest, Patrick refused to return the funds.

When the appellant learned that Joey had been hoodwinked and had lost the front money, he vowed to retaliate. He and Joey began with small acts of retribution (e.g., Joey cut Carol Ann's telephone line and put a stink bomb in her hallway). This petty harassment did not bring about a refund, so father and son constructed a pipe bomb, intending that it be used to frighten Patrick.

Patrick proved to be an elusive target. Not having learned his lesson, Joey trusted Carol Ann once again. She told him that Patrick's girlfriend was Diedre Nickerson and directed him to an address in Yarmouth, Maine. On the night of July 25, 1997, Joey and two companions proceeded to that address, found a car that they believed (mistakenly) belonged to Diedre Nickerson, and bombed it.

Fenton, 367 F.3d at 20 -21. With respect to the misjoinder claim," the First Circuit reasoned "the

key datum here is that the indictment charged the appellant and his confederates with having

used the pipe bomb during and in furtherance of the drug-trafficking conspiracy. The narcotics

sales and the pipe bomb charges were thus linked as elements of a common scheme or plan." Id.

at 21 (citation omitted).  With respect to the court's denial of a motion for severance, the Panel opined:

> Here, the appellant did not present sufficient facts to the district court (or to us, for that matter) to permit a finding that he had important testimony to offer. Apart from his bald assertion of innocence as to the pipe bomb counts and an unparticularized claim that the government's witnesses were not credible, his motion offered no hint as to the specific information that his testimony would convey. This sort of empty rhetoric is insufficient to mandate severance on the basis of a perceived need to testify.

Id. at 22 (citations omitted).

So, in an effort to distance his client from the pipe bomb related counts, trial counsel pursued a motion to sever, representing that his client was prepared to testify vis-à-vis  bomb charges but not on the drug transactions.  (Docket No. 12.)  This motion was rebuffed by the trial court (Docket No. 17), a determination affirmed by the First Circuit. In terms of this U.S.C. § 2255 action the evidence is that there was not much for counsel to argue to justify severance at that time and Fenton is still grasping at straws in focusing on the tape recording of a single conversation and the dispensation of computer proceeds as a means of distancing himself from the retaliatory pipe-bomb incident.

### 6.     Failure to cross-examine Carol Dorney (h)

The ineffective assistance Fenton identifies vis-à-vis the testimony of Carol Dorney is Attorney Beneman's failure to impeach her with her sworn testimony at the earlier trial of Joey Beeler.  (Pro se § 2255 Mot. at A-14.)  Fenton explains that Dorney testified at Fenton's trial that she had only met Coleman Fenton once, which would have been when Joey Beeler and Fenton came to her apartment in late July 1997 to inquire about plans to repay $1,600 which Carol and Patrick Dorney had stolen from Joey Beeler.  (Id. at A-15.)  "The significant portion of Carol Dorney's testimony at Joey Beeler's trial, which was ignored by David Beneman at Coleman

Fenton's trial, was where she testified that when Coleman Fenton and Joey Beeler came to her apartment to inquire about repayment of the $1,600.00, the bombing had already occurred." (Id.; see also Reply Mem. at 7-8.)  He opines:

> It was the government's theory at Coleman Fenton's trial, that following the meeting at Carol Dorney's apartment, he and Joey Beeler hatched a plan to bomb the vehicle of Patrick Dorney's girlfriend in order to extort repayment of the $1,600.00. It was in reaction to Carol Dorney's refusal to repay the money that according to the government, parts for the pipe bomb were purchased, followed by its construction in the basement of this petitioner's residence.  The above recited testimony of Carol Dorney at Joey Beeler's trial is clear in demonstrating that events could not have transpired as alleged by prosecutors and Joey Beeler.
> Mysteriously, David Beneman failed to capitalize on the contradiction existing between it's proof at Joey Beeler's trial and the evidence introduced at this Petitioner's trial.  As a consequence, this petitioner received a thirty (30) year sentence for providing the alleged pipe bomb to Joey Beeler.

(Pro se § 2255 Mot. at A-15-A-16)(emphasis added).  In his reply memorandum Fenton reiterates his assertion that Dorney's testimony at the first trial was, as he describes it, "radically different" than her testimony at Fenton's trial.  (Reply Mem. at 7.)

The United States responds that it is doubtful that the timing of the conversation is so very relevant to the charged conduct.  It also points out that the impeachment effect of any inconsistent testimony by Dorney was cumulative as the Government itself proactively elicited evidence concerning Dorney's guilty plea and sentence, the commission of a drug offense after her release from a half-way house, a plea agreement, and her hopes of leniency.[11]  Attorney Beneman followed with impeachment on Dorney's drug addiction and trafficking and emphasized the fact that Dorney testified at Joey Beeler's trial in exchange for a sentence reduction.

---

[11]    In his reply memorandum Fenton suggests that his attorney should have cross examined Carol Dorney and Joey Beeler on their inability to remember that Fenton wore a face mask during the period that his immune system was weak.  (Reply Mem. at 24.)  Such an attempt at impeaching these witnesses would have had minimal positive impact, if any.

With regards to Attorney Beneman's performance on this score, Fenton may well be right that raising the inconsistency in Dorney's testimony as to the timing of this conversation could have raised some doubt as to her testimony at Fenton's trial.  However, "even if an omission is inadvertent, relief is not automatic.  The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."  <u>Gentry</u>, 540 U.S. at 8.  And, given the overall context of the trial and the substantial impeachment of Dorney by both sides, there is not a reasonable probability that the outcome would have been different had counsel cross-examined Dorney on the timing discrepancy apropos her testimony at Joey's trial.  <u>See</u> <u>Strickland</u>, 466 U.S. at 694.

### 7. *Advising Attorney McKee to return his retainer (i)*

"Another example of David Beneman's divided loyalties," Fenton contends, relates to Fenton's efforts to employ Attorney Walter McKee.  (<u>Pro</u> <u>se</u> § 2255 Mot. at A-16.)  Fenton relates that he gave Attorney McKee a check for $30,000 as a retainer to represent him in his criminal case.  (<u>Id.</u>)  Although they had a representation agreement, McKee returned the check to Fenton a few days later without explanation.  (<u>Id.</u> at A16.)  Fenton says that he has since learned that immediately after his payment of the retainer to Attorney McKee, Attorneys Beneman and McKee went jogging together.  (<u>Id.</u> at A-16-A-17.)  Based upon the totality of Attorney Beneman's performance, Fenton urges that,

> one must conclude that David Beneman convinced Walter McKee not to represent this petitioner because the prosecutors and agents were eager to imprison this petitioner.  The fact that Walter McKee was a member of the committee which subsequently recommended David Beneman for appointment as the District of Maine's 'First Federal Public Defender' raises further suspicions about the context of discussions between David Beneman and Walter McKee during their aforesaid jogging episode.

(<u>Id.</u> at A-17.)

Fenton's speculation that a jog with Attorney Beneman had anything to do with Attorney McKee's decision to return the retainer, while inventive, is the type of 28 U.S.C. § 2255 claim that is ripe for summary dismissal.  See McGill, 11 F.3d at 225 ("When a petition is brought under section 2255, the petitioner bears the burden of establishing the need for an evidentiary hearing.  In determining whether the petitioner has carried the devoir of persuasion in this respect, the court must take many of petitioner's factual averments as true, but the court need not give weight to conclusory allegations, self-interested characterizations, discredited inventions, or opprobrious epithets.")(citations omitted); id. at 226.  ("In other words, a '§ 2255 motion may be denied without a hearing as to those allegations which, if accepted as true, entitle the movant to no relief, or which need not be accepted as true because they state conclusions instead of facts, contradict the record, or are "inherently incredible." ' ") (quoting Shraiar v. United States, 736 F.2d 817, 818 (1st Cir.1984) and citing Rule 4(b), Rules Governing Section 2255 Proceedings). Not surprisingly, Fenton does not defend the merits of this claim in his reply memorandum.

### 8.   *Refusal to interview family members (j)*

With regards to Fenton's challenge to Attorney Beneman's failure to interview family members, Fenton believes that this shortfall "deprived him of vital evidence which could have been used to impeach the testimony of Brenda Sue Beeler." (Pro se § 2255 Mot. at A-17.) Fenton explains that Brenda was Joey's half sister and was an active member of the armed forces, ostensibly making her a credible witness. (Id.)  However, it is Fenton's contention that because Brenda was raised by a mother addicted to heroin, "she has numerous psychological problems" leading to her discharge from the Army following her testimony. (Id. at A-17-A-18.)

> A minimum of research by David Beneman would have provided him with material for impeachment of Brenda Sue's testimony.  For instance, this petitioner informed Mr. Beneman that on the same day as her mother's funeral, Brenda Sue married Scott Camera, a local drug dealer living in the projects.

> Earlier, Scott Camera had dated Brenda Sue's sister, Kristin Beeler.  He commenced dating Brenda Sue after numerous sexual encounters with her where she received crack cocaine in exchange for sex.
>
> Although the aforesaid information was provided to David Beneman, not only by this petitioner but through others, he refused to incorporate it into his cross examination of Brenda Sue Beeler.  It would have totally discredited her direct testimony.

(Id. at A-18.)   The multiple affidavits submitted with the reply memorandum may be intended to support this ground although Fenton has not attempted to connect the dots for the court.  See supra footnote 3.  Indeed, some of the information that Fenton relies on -- most obviously changed stories -- could only have been discovered after the trial.

The United States points out that Attorney Beneman did heartily cross-examine Brenda Sue about her ambivalence toward her sister Kristin, her assistance is getting the addicted Kristin drugs, Brenda Sue's drug addiction, and her failure to graduate from high school.  Obviously Attorney Beneman could not have cross-examined Brenda Sue on her discharge from the Army which occurred after the trial.  Evidence of her willingness to trade sex for drugs and her marriage to a drug dealer was cumulative.  Once again, as with Fenton's claim pertaining to the tape recording of the conversation between Joey Beeler and Kelly Fenton:  "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."  Gentry, 540 U.S. at 8.[12]

### 9.    Failure to seek change of venue (p)

As for Attorney Beneman's performance surrounding the venue of Fenton's trial, Fenton states:

> The prosecution of this petitioner was extensively covered in the local newspaper, radio and television.  In addition, the press connected petitioner to an alleged bombing incident occurring in the early 1970[]s, to a local police officer.

---

[12]    With respect to any claim concerning a failure to investigate, Fenton notes that Kristin Beeler testified to meeting with two MDEA agents and Attorney Beneman made no effort to subpoena these reports.  (Reply Mem. at 10.)  Fenton does not explain how these reports would have supported the defense.

> That bombing appears to be the primary motivation for charging petitioner with the present offenses, and the press cooperated by making references to it. The atmosphere created by stories in the press and radio made it impossible for petitioner to receive a fair trial. David Beneman made no effort to protect petitioner from the prejudicial publicity.

(Pro se § 2255 Mot. at A-21.)

Fenton's conclusory presentation of this ground comes nowhere near making the required showing to trigger an inquiry into counsel's performance at this stage. See United States v. Perez-Gonzalez, 445 F.3d 39, 46 (1st Cir. 2006) ("There is nothing in the record-no statements by jurors indicating animus, no examples of inflammatory newspaper articles or prejudicial news reports, and no evidence whatsoever of the pervasiveness or tone of the media coverage-to substantiate Pérez-González's argument.") (footnote omitted).

### 10.     Failure to object to the testimony of Agent Joseph Robitaille (s)

Finally for consideration is Fenton's claim that Attorney Beneman should have objected to the testimony of Agent Joseph Robitaille that Fenton was known in the law enforcement community as being uncooperative. (Pro se § 2255 Mot. at A-22.) Fenton does not mention this claim in his reply brief.

> The United States responds:

> [T]here is no merit to Fenton's claim that Beneman unreasonably failed to object to testimony by ATF Agent Joseph Robitaille that Fenton had a reputation in the law enforcement community as being uncooperative. Although Fenton does not identify the page of the trial transcript where that question was put to Robitaille, it is at page 94. Robitaille testified that he did not try to speak to Fenton after the bombing "because of Mr. Fenton's reputation that he has among the law enforcement community."
>
> Reasonable counsel could make an informed decision not to object to this isolated question - asked at the end of redirect examination of Robitaille - because without elaboration, a "reputation" is neither good nor bad. To have objected would have suggested to the jury that Fenton's reputation was nefarious. It also might have suggested that Fenton, who did not testify and was not cross-examined, had a reputation within the law enforcement community because he had a history of criminal behavior. As the PSI explained, Fenton had been the

subject of criminal charges thirteen times. As a matter of trial tactics, defense counsel could choose not to pursue the matter through an objection, but instead let the brief exchange pass, and likely go unnoticed by anyone and especially the jury. See Pepe, 184 F.3d at 64 (counsel's strategic choices generally immune from hindsight review).

Here, moreover, in light of the extensive, first-hand testimony, some of it from members of Fenton's own family, that Fenton was involved in a wide-ranging network of drug dealing and enforced his authority by violent means, Fenton cannot carry his burden of showing that he was prejudiced by Beneman's decision not to object to this one question. See Strickland, 466 U.S. at 687. In all respects, the Sixth Amendment challenge to Beneman's performance fails.

(Gov't Suppl. Resp. at 19-20.)

I conclude that, taking the trial record as a whole, the United States is right in characterizing this choice not to emphasize or expand this aspect of Robitaille's testimony as an objectively sound tactical decision that survives Strickland's performance and prejudice scrutiny.


### Conclusion

For the reasons set forth above, I recommend that the Court deny Fenton 28 U.S.C. § 2255 relief as to these ten grounds.  I further recommend that a certificate of appealability should not issue in the event Fenton files a notice of appeal because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).


### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

January 29, 2009.

/s/Margaret J. Kravchuk
U.S. Magistrate Judge